**23-1814, 23-748**

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

SHEILA MARIE RITZE,

*Defendant-Appellant.*

———————————

On Appeal from United States District Court
for the Central District of California
Hon. Judge David O. Carter, District Judge
D.C. No. 20-CR-00002-DOC-2

———————————

## SHEILA MARIE RITZE'S INDIVIDUAL OPENING BRIEF

———————————

DAVID W. WIECHERT
WIECHERT, MUNK & GOLDSTEIN, PC
4000 MacArthur Blvd., Ste. 600
Newport Beach, California
(949) 361 2822
DWiechert@aol.com

COURTNEY L.C. CEFALI
CEFALI & CEFALI, APC
27136 Paseo Espada, Ste. 1123
San Juan Capistrano, CA 92675
(949) 325 7790
Courtney@callcefali.com

*Counsel for Defendant-Appellant,
Sheila Marie Ritze*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES..............................................................................iv

INTRODUCTION .............................................................................................1

STATEMENT OF JURISDICTION AND DETENTION STATUS..........4

ISSUES PRESENTED .....................................................................................4

STATEMENT OF THE CASE ........................................................................5

    A. Ritze's Conduct Ahead of the Lobster Fishing Trip .........................7

        i.    *Ritze's Generic Threats to Co-Workers* ...................................7

        ii.    *October 4, 2019 Las Vegas Trip* ..............................................8

    B. The October 14-15, 2019 Fishing Trip ..............................................9

    C. Dao's Cause of Death...................................................................11

    D. Ritze's Conduct Following the Lobster Fishing Trip......................12

    E. Ritze was Arrested and Interrogated ...........................................13

        i.    *Interrogation 1*.......................................................................14

        ii.    *Interrogation 2*.......................................................................15

    F. Ritze was Ultimately Charged with First-Degree Murder ............17

    G. Ritze Filed Numerous Pretrial Motions .........................................18

        i.    *Ritze Sought Exclusion of Pre-Arrest Statements*.................18

        ii.    *Ritze Sought Exclusion of Post-Arrest Statements* ...............19

    H. Ritze Proceeded to Trial................................................................21

    I. Jurors Began Their Deliberations ...............................................22

J.  Ritze was Found Guilty of Second-Degree Murder ........................22

K. Ritze Moved for a Judgment of Acquittal and a New Trial ...........23

L.  Ritze was Sentenced to 262 Months ...............................................23

SUMMARY OF ARGUMENT ....................................................................25

STANDARDS OF REVIEW ........................................................................27

ARGUMENT ...............................................................................................29

A. The District Court Erred in Admitting Ritze's Post-Arrest
   Statements....................................................................................29

   i.    *Ritze Did Not Voluntarily, Knowingly, and Intelligently
         Waive Her Miranda Rights During the First Interview* .......29

   ii.   *Readvisement was Required Before Ritze's Second Interview
         and Ritze Did Not Knowingly and Intelligently Waive Her
         Miranda Rights During the Second Interview*......................32

   iii.  *Ritze's Statements were Involuntary*....................................36

         1.  Ritze's Intoxication and Withdrawal Left Her Vulnerable
             to Psychological Pressure .................................................36

         2.  SA Cho Overpowered Ritze's Free Will...........................38

   iv.   *The Evidence's Admission was not Harmless*.......................42

B. The District Court Erred in Admitting Ritze's Statements to Co-
   Workers .........................................................................................44

C. The District Court Erred in Permitting the Victim's Mother to be
   Present During Deliberations ........................................................49

D. The District Court Erred When It Denied Ritze's Motion for
   Judgment of Acquittal on the Second-Degree Murder Count........52

  *i.*  *The Government Failed to Prove Ritze Harbored the Requisite Mens Rea at the Time of Dao's Death* ..................53

  *ii.*  *The Government Failed to Establish Ritze Caused or Aided Dao's Death* ..............................................................59

 E. The District Court Abused its Discretion When it Denied Ritze's Motion for a New Trial ..............................................................63

 F. The District Court Erred When it Failed to Apply the § 3B1.2 Minor Role Adjustment ...............................................................65

 G. The District Court Erred When it Refused to Adopt a Variance Based on Ritze's Personal History ..................................................69

CONCLUSION ..............................................................................................71

STATEMENT OF RELATED CASE........................................................72

CERTIFICATE OF COMPLIANCE.......................................................73

iii

# TABLE OF AUTHORITIES

**Cases**

*Ariz. v. Fulminante*
499 U.S. 279 (1991)................................................................49

*Blackburn v. Alabama*
361 U.S. 199 (1960)................................................................36

*Burrage v. United States*
571 U.S. 204 (2014)................................................................59

*Forbes Media LLC v. United States*
61 F.4th 1072 (9th Cir. 2023) ................................................50

*Frantz v. Hazey*
533 F.3d 724 (9th Cir. 2008)..................................................51

*Gladden v. Unsworth*
396 F.2d 373 (9th Cir. 1968)..................................................36

*Lynumn v. Illinois*
372 U.S. 528 (1963)................................................................39

*Malloy v. Hogan*
378 U.S. 1 (1964)..............................................................38, 39

*Medeiros v. Shimoda*
889 F.2d 819 (9th Cir. 1989)..................................................36

*Musladin v. Lamaque*
555 F.3d 830 (9th Cir. 2009)..................................................51

*Neder v. United States*
527 U.S. 1 (1999)....................................................................49

*Ortiz-Sandoval v. Gomez*
81 F.3d 891 (9th Cir. 1996)....................................................46

*Press-Enterprise Co. v. Superior Court*
    478 U.S. 1 (1986).........................................................................49

*Rodriguez v. McDonald*
    872 F.3d 908 (9th Cir. 2017).......................................................30

*Rose v. Clark*
    478 U.S. 570 (1986)......................................................................49

*Rosemond v. United States*
    572 US 65 (2014)...........................................................53, 54, 58

*Sills v. Bowersox*
    2018 U.S. Dist. LEXIS 142222 (E.D. Mo. 2018)................................50

*United States v Banks*
    282 F.3d 699 (9th Cir. 2002)......................................................36

*United States v. Alston*
    974 F.2d 1206 (9th Cir. 1992)................................................28, 63

*United States v. Andaverde*
    64 F.3d 1305 (9th Cir. 1995).......................................................34

*United States v. Begay*
    33 F.4th 1081 (9th Cir. 2022) ...............................................52, 53, 54

*United States v. Boam*
    69 F.4th 601 (9th Cir. 2023) ........................................................52

*United States v. Brown*
    785 F.3d 1337 (9th Cir. 2015)......................................................28

*United States v. Bryan*
    2023 U.S. App. LEXIS 23273 (9th Cir. 2023)....................................53

*United States v. Butler*
    249 F.3d 1094 (9th Cir. 2001)......................................................27

*United States v. Chadwell*
    793 F.3d 910 (9th Cir. 2015)........................................................50

*United States v. Craighead*
539 F.3d 1073 (9th Cir. 2008)...........................................................29

*United States v. Crews*
502 F.3d 1130 (9th Cir. 2007)...........................................................30

*United States v. Diaz*
884 F.3d 911 (9th Cir. 2018).................................................. 66, 67, 68

*United States v. Doe*
170 F.3d 1162 (9th Cir. 1999)...........................................................27

*United States v. Dominguez-Caicedo*
40 F.4th 938 (9th Cir. 2022) ....................................................*passim*

*United States v. Emmett*
749 F.3d 817 (9th Cir. 2014)............................................................68

*United States v. Evanston*
441 Fed. Appx. 492 (9th Cir. 2011)....................................................30

*United States v. Garibay*
143 F.3d 534 (9th Cir. 1998).......................................................29, 30

*United States v. Goldtooth*
754 F.3d 763 (9th Cir. 2014)............................................................54

*United States v. Graf*
610 F.3d 1148 (9th Cir. 2010)...........................................................52

*United States v. Guerrero*
803 F.2d 783 (3d Cir. 1986) .............................................................47

*United States v. Hitt*
981 F.2d 422 (9th Cir. 1992)............................................................45

*United States v. Klensch*
87 F.4th 1159 (9th Cir. 2019) .....................................................66, 68

*United States v. Lague*
971 F.3d 1032 (9th Cir. 2020)..........................................................28

vi

*United States v. Lincoln*
  630 F.2d 1313 (8th Cir. 1980)..............................................................63

*United States v. Main*
  113 F.3d 1046 (9th Cir. 1997).............................................................59

*United States v. Miller*
  984 F.2d 1028 (9th Cir. 1993).............................................................36

*United States v. Morrison*
  833 F.3d 491 (5th Cir. 2016)...............................................................60

*United States v. Narvaez-Gomez*
  489 F.3d 970 (9th Cir. 2007)...............................................................27

*United States v. Nordling*
  804 F.2d 1466 (9th Cir. 1986).............................................................33

*United States v. Olano*
  507 U.S. 725 (1993)............................................................................50

*United States v. Pineda-Doval*
  614 F.3d 1019 (9th Cir. 2010)......................................................54, 59

*United States v. Quintero-Leyva*
  823 F.3d 519 (9th Cir. 2016)...............................................................67

*United States v. Rising Sun*
  522 F.3d 989 (9th Cir. 2008)...............................................................28

*United States v. Rodriguez*
  44 F.4th 1229 (9th Cir. 2022) .......................................................65, 67

*United States v. Rodriguez-Preciado*
  399 F.3d 1118 (9th Cir. 2005).............................................................33

*United States v. Rojas-Millan*
  234 F.3d 464 (9th Cir. 2000)...............................................................66

*United States v. San Juan-Cruz*
  314 F.3d 384 (9th Cir. 2002)...............................................................33

*United States v. Sayetsitty*
  107 F.3d 1405 (9th Cir. 1997).........................................54, 60

*United States v. Swallow*
  109 F.3d 656 (10th Cir. 1997)..............................................59

*United States v. Tierney*
  424 F.2d 643 (9th Cir. 1970).................................................58

*United States v. Tingle*
  658 F.2d 1332 (9th Cir. 1981)........................................38, 39

*United States v. Trujillo*
  713 F.3d 1003 (9th Cir. 2013).......................................69, 70

*United States v. Walters*
  309 F.3d 589 (9th Cir. 2002)...............................................28

*United States v. Wells*
  879 F.3d 900 (9th Cir. 2018).........................................44, 45

*United States v. Williams*
  435 F.3d 1148 (9th Cir. 2006)..............................................44

*United States v. Woody*
  250 Fed. Appx 867 (10th Cir. 2007).....................................59

*United States v. Zavala-Mendez*
  411 F.3d 1116 (9th Cir. 2005)..............................................28

*Weaver v. Mass.*
  582 U.S. 286 (2017)...........................................................49

## Statutes

18 U.S.C. §1001 ..................................................... 4, 18, 43

18 U.S.C. §1111 ...................................................... *passim*

18 U.S.C. §2 ...................................................................4

18 U.S.C. §3 .................................................................13

18 U.S.C. §3553 ........................................................................ 3, 24, 69

18 U.S.C. §3742 .................................................................................. 4

18 U.S.C. §7(1) ................................................................................. 17

28 U.S.C. §1291 ................................................................................. 4

U.S.S.G. §3B1.2 ........................................................................ *passim*

## Other Authorities

Ninth Circuit Model Criminal Jury Instruction 16.2 ............................ 53

## Rules

Federal Rules of Appellate Procedure 32 ............................................ 73

Federal Rules of Evidence 403 ................................................. 19, 26, 28

Federal Rules of Evidence 404 ..................................................... *passim*

Federal Rules of Criminal Procedure Rule 29 ........................... 22, 23, 28

Federal Rules of Criminal Procedure Rule 33 .............................. *passim*

## INTRODUCTION

Early on October 15, 2019, Sheila Ritze (Ritze), Hoang Xuan "Wayne" Le (Le) and Tri Minh "James" Dao (Dao) launched Ritze's boat at Dana Point Harbor to lobster fish. There was a full moon, clear skies and low wind.

After setting lobster hoops, Ritze cruised approximately three miles offshore. Ritze was suddenly startled by a loud bang—a sound she attributed to the boat's engine backfiring. Ritze turned around, saw Le and Dao wrestling and heard additional gunshots—Dao fell into the water. With a gun in hand, Le ordered Ritze to "Go, go, go!" Ritze "freaked out" and brought the vessel back to shore. Neither Ritze nor Le reported the incident to law enforcement and continued to interact.

Fisherman discovered Dao's body offshore in San Diego County on the afternoon of October 16, 2019, wearing a bright orange jacket with color similar to a life vest and carrying the lobster fishing license Ritze required him to buy before the trip. The fisherman contacted the Coast Guard and a law enforcement investigation commenced.

In December 2019, a SWAT unit using flashbangs executed an early morning arrest of Ritze. As was typical, Ritze had gone to bed, heavily

intoxicated, a short time before. The flashbangs caused Ritze to suffer a bleeding gash on her forehead. She was handcuffed and escorted through the cold into a van. While *Miranda* warnings were read, Ritze could not appreciate their import. Discombobulated, she shook her head in agreement, mumbled "yes," and was interrogated for two hours.

Following a lengthy car ride to the Santa Ana Jail, Ritze underwent a medical evaluation before being insolated in an interrogation room for a second interview with a second set of agents. Ritze was not readvised of her *Miranda* rights. For nearly two hours, the agents repeatedly espoused the benefits of cooperation, weaponized Ritze's love for her young daughter, created a false sense of urgency, and made Ritze feel as if she had no choice but to submit to the agents' questioning.

On April 4, 2022, Ritze proceeded to trial, wherein the district court committed a host of errors. To begin, the district court allowed the introduction of Ritze's post-arrest interviews even though (1) Ritze did not knowingly waive her *Miranda* rights; (2) was not readvised of them as required; and (3) provided statements only after her will was overcome by unscrupulous tactics.

Further, the district court erroneously permitted the government

2

to introduce a surreptitious video recording captured in September 2019 by a co-worker's daughter wherein Ritze generically referenced "friends" who would be willing to "kill people in a heartbeat" and people going on her boat but not "com[ing] back."

During deliberations, jurors asked to review this recording again. The district court summoned jurors to the courtroom and, over defense objection, opened this part of their deliberations to the public. The video was replayed with the decedent's grieving mother in the courtroom.

On April 19, 2022, jurors returned a guilty verdict on second-degree murder, rejecting the government's evidence of premeditation and deliberation. But Ritze's conviction is not supported by the evidence. The government failed to establish Ritze's conduct proximately caused Dao's death as his gunshot wounds may not have been survivable even with emergency aid. There was also no evidence that Ritze developed any intent to kill Dao, a prerequisite for second-degree murder.

Ritze was sentenced to a term of 262 months—a sentence that failed to reflect her disparate offense role or a thoughtful consideration of the 18 U.S.C. § 3553(a) factors.

This Court must reverse.

## STATEMENT OF JURISDICTION AND DETENTION STATUS

Ritze appeals her April 17, 2023, 262-month sentence for one count of second-degree murder (18 U.S.C. §§ 1111(a), 1111(b), 2(a)) and one count of making a false statement (18 U.S.C. § 1001(a)(2)). 1-RitzeER-0002. Ritze timely appealed on April 20, 2023. 12-RitzeER-2975. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. Ritze is currently in custody with a projected release date of July 28, 2038.

## ISSUES PRESENTED

1. Whether the district court erred in admitting Appellant's post-arrest statements when

   - Appellant could not knowingly and intelligently waive her *Miranda* rights due to her apparent distress, physical injury and drug-addled condition;

   - Agents failed to readvise Appellant of her *Miranda* rights;

   - Appellant's statements were the product of psychological pressures that overbore Appellant's free will?

2. Whether the district court abused its discretion by allowing the government to admit a recording of Appellant making generic threats without a sufficient nexus to the instant offense?

3. Whether the district court committed structural error by allowing the victim's mother to remain in the courtroom during a portion of jury deliberations?

4

4. Whether sufficient evidence was presented to support a second-degree murder conviction when

- The evidence did not establish Appellant manifested an extreme indifference to human life or specifically intended to aid the principle in the victim's death;

- The government failed to establish Appellant's conduct was the proximate cause of the victim's death?

5. Whether the district court abused its discretion by denying Appellant's new trial to allow her to present a more narrowly tailored defense to second- as opposed to first-degree murder?

6. Whether the district court erred when it (1) refused to apply a U.S.S.G. § 3B1.2 (§ 3B1.2) minor role adjustment; and (2) failed to address Appellant's mitigating arguments in support of a reduced sentence?

## STATEMENT OF THE CASE

In 2019, Ritze was 40 years old, a San Juan Capistrano resident and employed at a property management company. About a decade earlier, in 2008, Ritze married Mica and together they had a daughter, River, who was 11 years old at the time of trial. 7-RitzeER-1745–47.

Ritze was a skilled fisher-woman, who frequently invited friends on her boat for leisurely cruises and fishing trips—particularly during lobster season. 8-RitzeER-1778–99, 1857.

Several years into Ritze's marriage, Ritze endured personal

hardships that led her into a psychological tailspin. In February 2014, Ritze's mother died by way of a self-inflicted gunshot wound to the head. 9-RitzeER-2240. Thereafter, Ritze's alcohol dependence became insatiable—she regularly showed up to work inebriated, routinely "pass[ed] out," and was arrested for driving under the influence. 8-RitzeER-1823, 9-RitzeER-2272–73. By 2017, Ritze's marriage deteriorated as a result of her substance abuse and infidelity. 7-RitzeER-1751, 9-RitzeER-2272. In 2019, Ritze was involved in a "near death," roll-over collision. 9-RitzeER-2244–46. Ritze's once "bubbly" demeanor was replaced with suicidal ideations. 9-RitzeER-2205, 2261, 2272–73, 2287–88.

And during this tumultuous time, in the summer of 2019, Ritze was introduced to Le—a drug dealer who preyed on Ritze's insecurities and substance abuse. 9-RitzeER-2187–88. Le also supplied drugs to his friend Dao who frequently owed Le money. 7-RitzeER-1510, 1522, 1554, 1603. Le invited Dao on the fateful fishing trip at an October 14, 2019, luncheon with Dao's common law wife and children. 7-RitzeER-1513, 1520–21.

A. <u>Ritze's Conduct Ahead of the Lobster Fishing Trip</u>

    i.    *Ritze's Generic Threats to Co-Workers*

Weeks prior to Dao's disappearance, on September 27, 2019, the daughter of Ritze's co-worker surreptitiously recorded a conversation between Ritze and her colleagues while at the office. 12-RitzeER-2874. The recording began *in medias res*:

> [co-worker 1]: Why you killing people today?
> [Ritze]: Why not? I'm gonna take 'em on my boat they may go on the boat but they are not gonna come back [sic].
> [co-worker 1]: You're going to kill people on your boat?
> [Ritze]: Yes.
> . . .
> [co-worker 2]: I just want to eat my cup o' noodles please.
> [Ritze]: You should because when you go down, you want to go down full.

12-RitzeER-2874.

The conversation included commentary on Ritze's "friends[']" willingness to "kill people in a heartbeat." *Id.*

> [Ritze]: Oh, I got friends that will just go kill people in a heartbeat so they are like all on standby and I'm like [unintelligible].
> [co-worker 1]: They were on standby for you to call them and tell them to go kill somebody?
> [unintelligible]
> [co-worker 2]: Aren't you afraid?
> [Ritze]: Afraid of what?
> [co-worker 2]: Like —

7

> [co-worker 1]: — Of killing people.
> [co-worker 2]: In general.
> [Ritze]: I'm not killing anybody. I have friends that will.

*Id.*

No one took Ritze's drunk banter seriously. Indeed, laughter was heard in the background and one co-worker agreed Ritze's drunken rants were "totally unbelievable." 9-RitzeER-2321.

### ii. *October 4, 2019 Las Vegas Trip*

On October 4, 2019, Ritze and her mother-in-law, Sandra Ritze (Sandra), had tickets to a Las Vegas Billy Idol concert. 7-RitzeER-1755–56. Ritze missed her flight and drove from California to Las Vegas with Le, Shawn Whalin (Whalin), and Dao. 7-RitzeER-1755–56, 10-RitzeER-2357. Sandra testified that Ritze, upon arriving in Las Vegas, was reluctant to introduce Dao, causing Sandra to ask his name. Ritze purportedly responded, "I don't want you to talk to him. We will be offing him this weekend." 8-RitzeER-1915.

Later that evening, Ritze, Sandra, Le, and Whalin engaged in a drunken conversation wherein Sandra asked about Dao's absence—Le supposedly claimed "they had 'offed him.'" 8-RitzeER1921–22. According to Sandra, Le boasted about killing people and stated, "[h]e owes me

between 20- and $40,000." 8-RitzeER-1923.

Sandra testified her interactions with these men were "the scariest thing [she had] ever been through," yet she never called the police, described them as "nice enough" and appeared to be smiling in videos taken during the weekend. 8-RitzeER-1928–31, 1967–72, 12-RitzeER-2876. Through these statements, Sandra was the only witness to testify Ritze had prior knowledge of a plot to kill Dao. Her testimony was thoroughly discredited and rejected when the jury acquitted Ritze of first-degree murder.[1]

B. The October 14-15, 2019 Fishing Trip

On October 14, 2019, Le, Dao and Dao's common law spouse Natalie Nguyen (Nguyen), went to lunch wherein Le invited Dao to go lobster fishing that evening. 7-RitzeER-1513, 1520–21. Nguyen testified that, during this lunch, Le asked Nguyen whether Dao had his life insurance

---

[1] After discovering a press release referencing Ritze's charges, Sandra celebrated the news proclaiming, "keep that witch in jail!!!" and conveyed her desire for custody of Ritze's daughter, River. 8-RitzeER-1934, 2010–12. Sandra researched the case and contacted law enforcement to recount her version of the Las Vegas trip. After the government used her statements to secure a first-degree murder charge, a Special Agent shared the updated press release with Sandra to which she replied, "It is good news. You guys did a good job." 8-RitzeER-2016.

9

in order. 7-RitzeER-1521–23. Dao "would often bring up the life insurance policy in front of [Le] saying that if anything happened to him, that [Nguyen] would take that life insurance policy and pay off the debt that he owed [Le]." 7-RitzeER-1522.[2]

Later that evening, Dao purchased a fishing license at Le's direction. 7-RitzeER-1524, 10-RitzeER-2405. Ritze required her guests to fish with a license. 8-RitzeER-1796.

Ritze launched her boat at Dana Point Harbor shortly after midnight. 10-RitzeER-2505. The boat, with Ritze, Le and Dao aboard, navigated about 50-100 meters outside of the jetty and stayed in the vicinity of Crawfish Rock, a known lobster fishing location, for approximately 20 minutes. 10-RitzeER-2523–25. Thereafter, the boat traveled approximately three miles offshore allowing time for the lobsters to crawl into the nets. 10-RitzeER-2509–13, 12-RitzeER-2902.

---

[2] During Nguyen's first three meetings with law enforcement, Nguyen never mentioned Dao's life insurance and told agents she did not know why Le would want to kill Dao. 7-RitzeER-1627–30. Special Agent Austin Casey testified that in January 2021, Nguyen asked him, "[a]re we lacking motive?" and then informed the Special Agent for the first time that Le had asked about the status of Dao's insurance policy at this lunch. 11-RitzeER-2607.

10

While driving the vessel, Ritze heard a loud "bang." 12-RitzeER-2945. Believing the boat's engine had backfired, she turned around and saw Le and Dao "wrestling" before hearing additional gunshots. 12-RitzeER-2895. Dao fell into the water. 12-RitzeER-2908, 2945. With a gun in hand, Le shouted at Ritze, "[g]o, go, go!" 12-RitzeER-2933. Ritze "freaked out" and complied. 12-RitzeER-2944. Ritze's boat returned to the harbor at approximately 2:50 a.m. 7-RitzeER-1693–1731. Neither Ritze nor Le contacted authorities.

On October 16, 2019, Dao's body was discovered by fisherman several nautical miles off Oceanside wearing a "bright orange" windbreaker. 6-RitzeER-1330–31, 1338. The parties stipulated "the amount of weight which would've sunk the fully-clothed body of Dao would have been less than 20 lbs., [and] nothing was tied to Dao's arms, legs, or any portion of his body" despite the presence of an anchor (16.5 lbs.) and chains (20 lbs.) on Ritze's vessel. 6-RitzeER-1397-98, 11-RitzeER-2615.

C. <u>Dao's Cause of Death</u>

The autopsy performed by pathologist Dr. Brankica Paunovic (Dr. Paunovic) revealed a gunshot wound in Dao's upper back as well as a

11

bullet wound and evidence of blunt force trauma on his head. 6-RitzeER-1370–80. Through the process of elimination, the cause of death was deemed "drowning, with blunt force injuries and gunshot wound of the head" as "contribut[ing] conditions." 6-RitzeER-1381, 1414–15.

Dr. Paunovic was unable "to determine whether Mr. Dao was conscious when he went into the water." 6-RitzeER-1415. When asked whether Dao would have survived if he had been "pulled from the water after he'd been shot and beaten," Dr. Paunovic testified, "it's hard to say how fast pulled from the water because it takes few minutes to drown. So if he was literally taken out the water within a minute and taken to a hospital *maybe* he would survive." 6-RitzeER-1381 (emphasis added).

When prompted further, "[y]ou really don't know if Mr. Dao was picked up out of the water and taken back to Dana Point or some other location along the coast whether he would've survived or not, do you?" she admitted, "*I don't.*" 6-RitzeER-1424 (emphasis added).

D. <u>Ritze's Conduct Following the Lobster Fishing Trip</u>

Ritze continued to associate with Le after the lobster fishing trip.

In November 2019, Ritze and Le went to Las Vegas to celebrate her birthday. 9-RitzeER-2118–19. Ritze referred to Le as her "sweetheart."

9-RitzeER-2225. Ritze continued to be infatuated with Le. *See*, *e.g.*, 9-RitzeER-2060–64, 2079–81, 2085–89.

Ritze also provided Le with a tracking device and was aware that Le placed the device on Nguyen's vehicle in the aftermath of Dao's death. 9-RitzeER-2068–76. Ritze and Le exchanged messages regarding the tracker and Nguyen's location. *Id.*

E. Ritze was Arrested and Interrogated

On December 18, 2019, a complaint was filed charging Ritze with a single count—accessory after the fact (18 U.S.C. § 3, 1111). On December 19, 2019, Ritze was arrested at her San Juan Capistrano home.

In the days leading up to her arrest, Ritze was heavily intoxicated. 13-RitzeER-3175. The day prior, Ritze "consumed at least one-half of a handle of Tito's Vodka (a handle being 1.75 liters), snorted about 2 grams of cocaine, and smoked a gram of methamphetamine." *Id.* She also "ingested a half a pill of Adderall and a quarter bar of Xanax." *Id.* Ritze "lost consciousness (either from falling asleep, blacking out, or a combination of both) around 4:30 a.m." *Id.*

At approximately 5:00 a.m., federal agents executed a warrant at Ritze's home. *Id.* Agents burst in utilizing a flashbang—a diversionary

13

device that "emits bright light," designed to "distract or disorient subjects." 4-RitzeER-0876, 13-RitzeER-3175. After being struck with the flashbang's fiery embers, a visible gash was caused on Ritze's forehead with blood "dripping down." 4-RitzeER-0897, 13-RitzeER-3175. Ritze was handcuffed, escorted outside through the cold, and placed in the back of a van with armed agents. 13-RitzeER-3175.

### i. *Interrogation 1*

At 5:36 a.m., Special Agent Matthew Coughlin (SA Coughlin) and Special Agent Austin Casey (SA Casey) began the initial interrogation. 14-RitzeER-3240. Without any reference to the appellation "*Miranda*," and alluding to the warnings as a mere formality, SA Coughlin stated, "before we ask you any questions, you must understand your rights." 14-RitzeER-3242. No *Miranda* waiver form was executed. Ritze apparently "nodd[ed] her head" and mumbled, "yes." *Id.*

Ritze's shock and confusion was unmistakable. *See, e.g.*, 14-RitzeER-3240 ("I know your head's spinnin' right now [sic]."); 14-RitzeER-3269 ("Sheila, stay with me, I know you're scared."); 14-RitzeER-3275 ("I don't want you to freak out right now. Cause I want you to stay with me and try to stay calm. And I know that's very hard to do

14

right now[.]"). Ritze lacked the mental capacity to speak cogently with law enforcement. *See*, *e.g.*, 14-RitzeER-3242 ("I was just half asleep and freaked out of my mind, shaking— . . . I was bleeding in my eye[.]"); 14-RitzeER-3299 ("I'm so freaked out of my mind.").

As if the very visible wound on her forehead was not readily apparent, Ritze affirmatively conveyed the "fire" "hit [her] in the head"— but questioning did not cease. 14-RitzeER-3278. When asked basic questions (i.e., date of birth, address, phone number), Ritze assumed her mental capacity was being tested as a result of her injury. 14-RitzeER-3252 ("Are you just asking me these cause my head [sic]?").

Ritze was compelled to make statements about her relationship with Le, her fishing and boating expertise as well as the October 15th lobster fishing trip. The two-hour interrogation terminated at 7:49 a.m. 14-RitzeER-3346.

### ii. *Interrogation 2*

Ritze was then driven to the Santa Ana Jail, booked into custody, and taken for a brief medical evaluation at 10:45 a.m. The second interrogation, lasting two hours, began shortly thereafter and was conducted by two different interrogators, Special Agent Andrew Cho (SA

15

Cho) and Special Agent Christopher Gicking (SA Gicking). 1-RitzeER-0211, 13-RitzeER-3175, 13-RitzeER-3213.

SA Cho noted in his interview preamble that Ritze was "in shock back there" and espoused the benefits of cooperating, saying things like "99% of [interrogatees] regret" not cooperating and that he was looking for "information that can help us, like I said, it's gonna in turn help you." 14-RitzeER-3349. SA Cho agreed that the gist of these comments conveyed, "if you talk to us, you'll help yourself." 4-RitzeER-0971–72.

SA Gicking continued, "so-so you're clear-as a reminder, you know, you were read your *Miranda* rights, it's still in play, nothing's changed." 14-RitzeER-3349. Ritze did not know SA Gicking was referring to the untitled "rights" SA Coughlin read at the beginning of the first interview. 13-RitzeER-3176. That was the only reference to *Miranda* or "rights" in general in the second interview. SA Cho chose not readvise Ritze of her rights because "he had full faith in [his] fellow agents that advice was properly given to Ms. Ritze earlier." 4-RitzeER-0972. Ritze gave a one-word response, "[o]kay." 14-RitzeER-3349.

SA Cho was extremely combative—preventing Ritze from providing complete responses and dangling Ritze's freedom above her like a carrot.

16

SA Cho grew increasingly aggressive—swearing at Ritze on multiple occasions. 14-RitzeER-3393, 3428–31. SA Cho induced Ritze to cooperate by creating a false sense of urgency—as if her answers could save her from the already-filed criminal action. 14-RitzeER-3332, 3397, 3414–15. SA Cho suggested Ritze's ability to see her daughter grow up would depend on her performance during the interview. 14-RitzeER-3375–76, 3394.

F. Ritze was Ultimately Charged with First-Degree Murder

On January 2, 2020, the government returned an Indictment charging Le with first-degree murder (18 U.S.C. §§ 1111, 7(1)) and Ritze with a violation of 18 U.S.C. § 3, accessory after the fact. 12-RitzeER-2983.

On June 24, 2020, the First Superseding Indictment was filed charging Le and Ritze with first-degree murder, conspiracy, and possession of a firearm. 12-RitzeER-2983. Ritze was no longer charged with accessory after the fact but was also charged with making a false statement (18 U.S.C. § 1001(a)(2)). 12-RitzeER-2983. On March 31, 2021, the Second Superseding Indictment was returned charging Le and Ritze with an additional count of conspiracy to distribute narcotics. 5-RitzeER-

17

1243.

Ritze and Le each moved for, and the district court granted, severance. Le's jury trial commenced on November 8, 2021, and Le was found guilty of all counts.

G. Ritze Filed Numerous Pretrial Motions

Relevant here, Ritze filed three pretrial motions seeking the exclusion of statements and dismissal of various counts of the Indictment.[3]

### i.    Ritze Sought Exclusion of Pre-Arrest Statements

First, Ritze sought exclusion of the above-referenced September 27, 2019 statements to co-workers arguing these statements were irrelevant and prejudicial under Federal Rules of Evidence (FRE) 403 and 404. 14-RitzeER-3456.

The district court acknowledged the vagueness of these statements: "[E]specially the relevant portions about taking out on a boat, not coming

---

[3] Ritze and Le requested dismissal of Counts One through Three of the First and Second Superseding Indictment due to the government's failure to allege crimes within the special maritime and territorial jurisdiction of the United States. Ritze and Le challenge the district court's denial in a separately filed, joint brief.

back, I understand from the defense's standpoint that those could be generalized statements." 5-RitzeER-1125. The district court excluded "general statements Ritze made such as not being a person the co-workers want to mess with and being able to kick their ass[.]" 1-RT-497. The remaining portion was admitted. 12-RitzeER-2874.

### ii. Ritze Sought Exclusion of Post-Arrest Statements

Appellant also moved to exclude the two lengthy post-arrest interrogations. 13-RitzeER-3149. Ritze challenged both interrogations on the basis that she did not knowingly and intelligently waive her *Miranda* rights, readvisement was necessary ahead of the second interrogation, and her statements were coerced and involuntary. *Id.*

In support of the motion, Dr. Mark Fillmore, Ph.D. (Dr. Fillmore), submitted a declaration and testimony regarding his extensive studies of the psychological effects of substance abuse. 5-RitzeER-1002, 13-RitzeER-3178. Dr. Fillmore opined that individuals, like Ritze, who regularly abused substances at high frequency and amounts suffered severe symptoms of withdrawal if the user went without consumption, even for a few hours. 13-RitzeER-3179. This type of withdrawal results in "confusion," "disturbance in broad cognitive functioning," "slowed

19

information processing" and even seizures. 13-RitzeER-3180. Dr. Fillmore estimated that Ritze's blood alcohol concentration (BAC) was approximately 0.127% at the time of her first interrogation. 5-RitzeER-1003.

On behalf of the government, Santa Ana Jail Nurse Heather Sanchez (Sanchez) concluded Ritze did not present a "serious" case of alcohol intoxication or withdrawal at the time of her initial medical triage at the Santa Ana Jail. 13-RitzeER-3088. But Sanchez did not complete Ritze's initial examination and instead performed a screening hours later—at 4:33 p.m. 4-RitzeER-0811, 0836.

Despite her stated conclusions, Sanchez treated Ritze as if she was susceptible for severe symptoms of withdrawal. Ritze was prescribed an antiseizure medication as a "precautionary measure under the alcohol detox protocol." 4-RitzeER-0819, 0822–33, 0842. Ritze was placed in a low bunk and encouraged to drink fluids. 4-RitzeER-0849–50. After Ritze suffered two panic attacks, one while in court and the other in the van, Sanchez also provided Ritze with "comfort medication." 4-RitzeER-0851–52, 0848–49.

The district court held an evidentiary hearing before denying

20

Ritze's motion. 1-RitzeER-0136, 4-RitzeER-0801, 0871, 0921, 0946. The court determined Ritze was read her *Miranda* rights before the first interview and replied, "yes"—which the court found to be a "knowing and intelligent waiver[.]" 1-RitzeER-0208. The court found the *Miranda* reminder "adequate because of the shortness of time and the Ninth Circuit's prior rulings in this regard." 1-RitzeER-0217. The court acknowledged the second interview was "very aggressive" but found that the agents' conduct did not "over[i]de the will of this Defendant[.]" 1-RitzeER-0212, 0216.

Significant portions of Ritze's two interrogations were introduced at trial. 12-RitzeER-2877–2974.

H. Ritze Proceeded to Trial

Ritze's jury trial began April 4, 2022. On April 12, 2022, the government rested its case. 10-RitzeER-2530. At that time, Ritze moved for acquittal under Federal Rules of Criminal Procedure (FRCP) Rule 29 and then renewed the motion after close of evidence. 10-RitzeER-2535, 11-RitzeER-2627. The district court denied the motion and submitted the case to jurors on first-degree murder and lesser offenses. 11-RitzeER-2673.

21

### I. Jurors Began Their Deliberations

On April 14, 2022, jurors began deliberating and by the afternoon of April 15, 2022, jurors requested to review "the TPM cell phone office video" (i.e., the recording captured by Ritze's co-workers) and "the Billy Idol concert video that includes audio?" 3-RitzeER-0644.

Before the videos were replayed in open court,[4] Ritze objected to the victim's mother's presence, who had been seen "visibly crying" during the proceedings: "[w]e believe that this courtroom should be cleared for purposes of hearing this," adding, "[t]here's no public right to be in a jury deliberation." 1-RitzeER-0125–27.

Citing the First Amendment, the district court denied Ritze's request, describing the replay as "an open proceeding" to which "[t]he public's entitled to be present." 1-RitzeER-0125, 0128. The victim's mother remained in the courtroom during the replay.

### J. Ritze was Found Guilty of Second-Degree Murder

The trial concluded on April 19, 2022, with guilty verdicts on Counts 1 and 13: second-degree murder (a lesser included offense) and

---

[4] Ritze objected to the recordings being played in the courtroom in lieu of the deliberation room. 1-RitzeER-0127.

making a false statement. 3-RitzeER-0637, 0641.

    K. <u>Ritze Moved for a Judgment of Acquittal and a New Trial</u>

Ritze filed a Motion for Judgment of Acquittal Pursuant to Rule 29, or in the Alternative, Motion for a New Trial Pursuant to Rule 33. 2-RitzeER-0492. Appellant argued there was insufficient evidence to support a second-degree murder conviction.

In the alternative, Ritze moved for a new trial on four separate grounds: (1) the second-degree murder finding was contrary to the evidence; (2) a new trial would allow Ritze to focus her defense on second- as opposed to first-degree murder; (3) the district court erred in admitting Ritze's custodial interviews; and (4) Dao's mother's presence during jury deliberations constituted structural error. 2-RitzeER-0492.

The district court denied the motion in its entirety. 1-RitzeER-0085, 0112–17.

    L. <u>Ritze was Sentenced to 262 Months</u>

In preparation for sentencing, the Probation Office issued a Presentence Report (PSR) containing a proposed Guideline calculation. The PSR recommended a two-level minor role adjustment under § 3B1.2(b), describing Ritze as "substantially less culpable than the

average participant" and "a minor participant in the criminal activity." PSR-8–10. Following the government's objection, however, Probation reversed course and concluded Ritze was ineligible for the adjustment. Probation Addendum 1, p. 2.

Ritze filed a sentencing memorandum demonstrating why the 18 U.S.C. § 3553(a) factors warranted leniency. 2-RitzeER-0289. Ritze was born into a tumultuous family with parents who also suffered from significant substance abuse and often swept Ritze into their physical battles. 2-RitzeER-0303. At 17, Ritze ran away from home with her abusive boyfriend, with whom she had a daughter, Kelly. 2-RitzeER-0296. Ritze's substance abuse caused a series of arrests and ultimately the loss of Kelly's custody. 2-RitzeER-0296–97.

Ritze's sentencing memorandum presented additional mitigating evidence of her prior time in prison and personal renaissance after being released—wherein Ritze gained meaningful employment, was married, purchased a home, and welcomed her second child, River. 2-RitzeER-0297–98. Ritze shared the circumstances that led to the instant offense, her substance abuse issues, verified Post-Traumatic Stress Disorder (PTSD), and the progress she made while in custody. 2-RitzeER-0304–

24

05. Ritze also urged the district court to apply the § 3B1.2 minor role reduction. 2-RitzeER-0282–83, 0285, 0295, 0299–300.

The district court denied the § 3B1.2 minor role reduction finding Ritze's "callousness" rendered her undeserving of the adjustment. 1-RitzeER-0069–72. The district court calculated Ritze's Guideline range at 262 to 327 months and sentenced Ritze to 262 months on Count 1 and 60 months on Count 13, to be served concurrently. 1-RitzeER-0075–77.

## SUMMARY OF ARGUMENT

*First*, the district court erred when it admitted Ritze's post-arrest interviews. Although Ritze was initially advised of her *Miranda* rights, Ritze's level of intoxication, physical injury, and distress did not allow her to knowingly and voluntarily relinquish her rights. Hours later, agents purposely chose not to readvise Ritze despite the lengthy gap in questioning and the circumstances underlying the initial advisement including the "shock" she suffered during the arrest. Without sufficient warnings, and using aggressive interrogation techniques, agents coerced Ritze to provide involuntary statements.

*Second*, the district court erred when it allowed the introduction of a covert recording of Ritze's outlandish statements to co-workers. Ritze's

25

statements did not demonstrate any novel plot, or any reference to Le or Dao. The recording was inadmissible character evidence under FRE 404 and unduly prejudicial under FRE 403.

*Third*, the district court committed structural error when it held a portion of the jury deliberations open to the public. The fundamental fairness of the proceedings was compromised when Dao's grieving mother was permitted to be present while evidence was replayed.

*Fourth*, the government failed to present evidence to support the second-degree murder conviction. The record lacked a sufficient showing that Ritze harbored the requisite *mens rea* to support the jury's verdict. The evidence did not prove Ritze's conduct proximately caused Dao's death.

*Fifth*, the touchstones of Federal Rules of Criminal Procedure Rule 33 warrant a new trial here. "Fundamental fairness" and "the interests of justice" militates towards a finding that Ritze should be afforded the opportunity to defend against a charge of second- as opposed to first-degree murder.

*Sixth,* the district court erred when it failed to engage in the *United States v. Dominguez-Caicedo*, 40 F.4th 938, 960 (9th Cir. 2022) three-part

26

test and denied Ritze's request for a § 3B1.2 minor role adjustment.

*Finally*, the district court abused its discretion by failing to address numerous nonfrivolous, mitigating arguments advanced in support of a reduced sentence.

*Further*, Ritze and Le have separately filed a Joint Opening Brief asserting that Counts One through Three must be dismissed because the offense conduct did not occur within the special maritime and territorial jurisdiction of the United States. If the Court agrees, Ritze requests that the case be remanded for resentencing as to Count 13.

**STANDARDS OF REVIEW**

The Court reviews de novo the district court's "decision to admit statements that may have been obtained in violation of *Miranda*." *United States v. Narvaez-Gomez*, 489 F.3d 970, 973 (9th Cir. 2007). The underlying factual findings "are reviewed for clear error." *Id.* Whether a defendant's confession was voluntary is reviewed de novo. *United States v. Doe*, 170 F.3d 1162, 1168 (9th Cir. 1999). The admission of statements made in violation of *Miranda* is reviewed for harmless error. *United States v. Butler*, 249 F.3d 1094, 1098 (9th Cir. 2001).

Whether specific evidence falls within the scope of FRE 404(b) is

27

reviewed de novo while the district court's admission of "other act" evidence under Rules 403 and 404(b) is reviewed for an abuse of discretion. *United States v. Lague*, 971 F.3d 1032, 1037 (9th Cir. 2020).

The Court must determine whether the complained-of structural error impacted "the framework within which the trial proceeds." *United States v. Walters*, 309 F.3d 589, 593 (9th Cir. 2002) (internal quotations omitted). No prejudice need be shown. *United States v. Brown*, 785 F.3d 1337, 1350 (9th Cir. 2015).

The Court "review[s] a district court's denial of a Rule 29 motion for judgment of acquittal de novo." *United States v. Zavala-Mendez*, 411 F.3d 1116, 1118 (9th Cir. 2005).

A district court's denial of a motion for a new trial pursuant to FRCP 33 is reviewed for an abuse of discretion. *United States v. Alston*, 974 F.2d 1206, 1212 (9th Cir. 1992).

The Court "reviews a district court's interpretation[] of the federal Sentencing Guidelines de novo, its factual determinations for clear error, and its application of the Sentencing Guidelines to the facts as it has found them for abuse of discretion." *United States v. Rising Sun*, 522 F.3d 989, 993 (9th Cir. 2008).

28

## ARGUMENT

A. <u>The District Court Erred in Admitting Ritze's Post-Arrest Statements</u>

In *Miranda v. Arizona*, the Supreme Court held, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966). "[T]he Supreme Court adopted prophylactic procedural measures to guarantee that a suspect is advised of h[er] Fifth Amendment rights before custodial interrogations." *United States v. Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008).

There is no dispute that the interrogations of Ritze were custodial and *Miranda* applies.

    i.    *Ritze Did Not Voluntarily, Knowingly, and Intelligently Waive Her <u>Miranda</u> Rights During the First Interview*

In order for "inculpatory statements made by a defendant during custodial interrogations to be admissible in evidence, the defendant's waiver of *Miranda* rights must be voluntary, knowing and intelligent." *United States v. Garibay*, 143 F.3d 534, 536 (9th Cir. 1998) (cleaned up). Waiver must be "the product of a free and deliberate choice rather than

29

intimidation, coercion, or deception," and it must have been "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Rodriguez v. McDonald*, 872 F.3d 908, 921-22 (9th Cir. 2017) (internal quotation omitted).

"A defendant's mental capacity directly bears upon the question whether [s]he understood the meaning of h[er] *Miranda* rights and the significance of waiving h[er] constitutional rights." *Garibay*, 143 F.3d at 538. If the accused is intoxicated when she is read her rights, any waiver is invalid if her inebriated condition "reaches the level of incapacitation that [it] overcomes the defendant's free will." *United States v. Evanston*, 441 Fed. Appx. 492 (9th Cir. 2011).

To determine the validity of a *Miranda* waiver, the Court considers multiple factors in a totality of the circumstances analysis: (1) defendant's mental capacity; (2) whether the defendant signed a written waiver; (3) the language used to provide the advisement; (4) defendant's apparent understanding of the rights; (5) whether defendant's rights were individually and repeatedly explained; and (6) whether the defendant had prior experience with the criminal justice system. *United States v. Crews*, 502 F.3d 1130, 1140 (9th Cir. 2007). There is a

30

"presumption against waiver, of which the Government bears the burden of overcoming by a preponderance of the evidence." *Id.* at 1139-40.

Upon arrest, Ritze lacked the mental capacity to appreciate and knowingly relinquish her rights. After consuming at least one-half of a handle of Tito's Vodka, 2 grams of cocaine, a gram of methamphetamine, a half a pill of Adderall, and a quarter bar of Xanax on December 18, Ritze had her last drink around midnight and then passed out around 4:30 a.m. 5-RitzeER-1001, 13-RitzeER-3175. Thirty minutes later, agents stormed her home and threw two flashbangs. 5-RitzeER-1001. Ritze's head sustained a visible, bloody gash. 4-RitzeER-0897, 5-RitzeER-1001, 13-RitzeER-3175.

Ritze was handcuffed and ushered shivering into a van for the first interrogation. Ritze's intoxication and foggy demeanor was evident. Ritze was soft spoken, provided one-word responses, and tearfully mumbled to agents. 14-RitzeER-3238. Acknowledging her obvious distress, the agent remarked, "I know you're [sic] head's spinnin' right now." 14-RitzeER-3240. By Dr. Fillmore's estimate, Ritze's BAC was .127%. 5-RitzeER-1003. The district court did not dispute Ritze's consumption and stated, "the Court has no disagreement nor would [it] ever insinuate that there

31

wasn't a large amount of alcohol consumed[.]" 1-RitzeER-0216.

Under these circumstances, Ritze received her only *Miranda* warnings—which were referenced as a mere formality because Ritze was handcuffed. *See, e.g.,* 14-RitzeER-3242 ("So because our policy is I have to read you your rights now because you're in handcuffs[.]"). No explanation of these rights was provided. No written waiver form was utilized. Although Ritze apparently shrugged in agreement and muttered, "yes," the circumstances undermine any argument that Ritze truly appreciated the rights she was relinquishing. *Id.*

Ritze's alcohol and drug usage hours before the interview, being suddenly woken up from her stupor, being injured and disorientated by the use of flashbangs, and lacking warm clothing all weigh against a finding that Ritze's *Miranda* rights waiver was knowing and intelligent. The fruits of the first interview should have been suppressed.

> ii. *Readvisement was Required Before Ritze's Second Interview and Ritze Did Not Knowingly and Intelligently Waive Her <u>Miranda</u> Rights During the Second Interview*

It is "imperative" that the government take *Miranda* warnings seriously—"the government cannot and should not presume that individuals are already aware of what rights they possess prior to being

questioned." *United States v. San Juan-Cruz*, 314 F.3d 384, 389 (9th Cir. 2002). When an "appreciable time" elapses between two interrogations, law enforcement must repeat *Miranda* warnings. *United States v. Nordling*, 804 F.2d 1466, 1471 (9th Cir. 1986). Whether an accused must be re-read her *Miranda* rights before a succeeding interrogation is a totality of the circumstances evaluation with the key inquiry being whether there were "intervening events which might [give the accused] the impression that h[er] rights had changed in a material way." *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1129 (9th Cir. 2005).

Prior to Ritze's second interrogation, shortly after 10:46 a.m., the agent simply stated, "And just as a reminder, so-so you're clear-as a reminder, you know, you were read your *Miranda* rights, it's still in play, nothing's changed" to which Ritze replied, "Okay." 14-RitzeER-3349. The agents failed to describe these rights and this was the first instance that law enforcement referenced *Miranda* at all.

SA Cho had *Miranda* waiver forms available to him but chose not to readvise Ritze because "he had full faith in [his] fellow agents that advice was properly given to Ritze earlier." 4-RitzeER-0927. There can be no doubt that the agents' decision to refrain from fully advising Ritze of

33

her *Miranda* rights was designed to take advantage of Ritze's "shock" and certainly intended to elicit incriminating statements. Indeed, at the outset of the second interview, SA Cho acknowledged, *"I know you were in shock back there with all- all the stuff going on and now I'm sure you've calmed down a little bit, right? . . . you're a little bit more awake . . . ."* 14-RitzeER-3349 (emphasis added). In fear that readvisement may jeopardize law enforcement's ability to obtain a more detailed confession, none was given. The totality of the circumstances weigh in favor of a finding that readvisement was required and Ritze did not knowingly waive her rights ahead of this second interview.

Approximately five hours passed between the initial interview and the second. Ritze acknowledges that the Court has determined that lengthier breaks in questioning have not warranted repeated warnings. *See United States v. Andaverde*, 64 F.3d 1305, 1313 (9th Cir. 1995). However, the length of time is not dispositive here—it is the not gap in questioning alone for which Ritze complains. When the initial warnings were administered, Ritze had just been violently aroused from her alcohol and drug-induced sleep. She had a gash on her forehead. She was escorted outside into a van in handcuffs to be interviewed by armed

34

officers. In a state of terror, confusion and "shock," Ritze was read her rights. Once the first interview was complete, she was then transported to Santa Ana where she was booked into custody, provided a medical examination, and then aggressively interrogated by two different agents.

Given the circumstances, it is unreasonable to expect that Ritze would not only remember but also appreciate the *Miranda* warnings given five hours earlier. Ritze did not know SA Cho was referring to the rights read to her at the beginning of the first interview. RitzeER-3175.

The combined force of the length of time between the interviews and the events giving rise to the first admonition cut against agents' failure to readvise Ritze of her rights. The vague "reminder" that Ritze's "*Miranda* rights" were "still in play," in no way conveyed Ritze's constitutional protections. SA Cho was right when he acknowledged that Ritze was in "shock" at the first interview. Instead of ensuring she understood her *Miranda* rights hours later, he gave a veiled reference to them and then undercut the notion that Ritze's statements would be used against her by representing that speaking would help her. 4-RitzeER-0971, 14-RitzeER-3350. Ritze's second interview should have been suppressed.

35

### iii. *Ritze's Statements were Involuntary*

In the alternative, Ritze's statements to law enforcement were involuntary. "An involuntary statement by a defendant violates the Due Process Clause of the Fifth Amendment." *United States v. Miller*, 984 F.2d 1028, 1030 (9th Cir. 1993). Both physical "and psychological pressure" can result in involuntary confessions. *Id.* (citing *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960)). The Court's determination turns on "whether the defendant's will was overborne when the defendant confessed." *Miller*, 984 F.2d at 1031.

## 1. Ritze's Intoxication and Withdrawal Left Her Vulnerable to Psychological Pressure

"A confession made in a drug or induced state, or one that is the product of physical or psychological pressure, may be deemed voluntary" but only if it is "the product of a rational and intellect and a free will[.]" *United States v Banks*, 282 F.3d 699, 706 (9th Cir. 2002), *rev'd on other grounds,* 540 U.S. 31 (2003) (quoting *Medeiros v. Shimoda*, 889 F.2d 819, 823 (9th Cir. 1989)); *see also, Gladden v. Unsworth*, 396 F.2d 373, 380-81 (9th Cir. 1968).

Several of the deleterious long-term effects of alcohol and substance abuse laid out by Dr. Fillmore are relevant to the involuntariness inquiry,

36

particularly the impact long-term use has on a user's impulse control and decision-making abilities. 13-RitzeER-3179. During the first interview, Ritze had only recently woken up from a bender encompassing at least one-half of a handle of Tito's Vodka, cocaine, methamphetamine, Adderall and Xanax. 13-RitzeER-3175. Dr. Fillmore estimated that Ritze's BAC was 0.127% at the time of her first interrogation. 5-RitzeER-1003.

Within an hour from being awoken by flashbangs, Ritze was compelled to make statements about the fateful lobster fishing trip. But these statements were not the product of rational intellect. Instead, Ritze repeatedly conveyed she was "freaked out of [her] mind," "shaking" and "scared." 14-RitzeER-3242, 3265, 3267.

Approximately five hours later, her second interview began. Ritze exhibited symptoms of withdrawal. Ritze was fatigued, sweating, nauseous and had difficulty answering the agents' questioning. 13-RitzeER-3176. These symptoms were consistent with Dr. Fillmore's findings that individuals who regularly abused substances would suffer from withdrawal symptoms hours after consumption. 13-RitzeER-3179. Santa Ana Jail personnel took steps to prevent Ritze from experiencing

other physical manifestations of withdrawal: seizures, falls, dehydration, and panic attacks. 4-RitzeER-0819, 0822–25, 0842, 0848–51.

Ritze's intoxication and later symptoms of withdrawal left her cognitively impaired and unable to protect herself when pressured to make incriminating statements. Her decision-making was compromised and she was susceptible to being—and ultimately was—overborne by trained agents' pressures to speak against her will.

### 2. SA Cho Overpowered Ritze's Free Will

A confession "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *United States Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981) (internal quotations omitted). Involuntary confessions do not only arise from "express threats so direct as to bludgeon a defendant into failure of the will," but "[s]ubtle psychological coercion suffices as well, and at times more effectively, to overbear a rational intellect and a free will." *Id.* (citing *Malloy v. Hogan*, 378 U.S. 1, 8 (1964)).

When, as here, "law enforcement deliberately prey[s] upon the maternal instinct and inculcate fear in a mother that she will not see her

38

child in order to elicit 'cooperation,' they exert the 'improper influence' proscribed by *Malloy*." *Tingle*, 658 F.2d at 1336. Courts have routinely disavowed such weaponizing of a mother's love. *See, e.g., Lynumn v. Illinois*, 372 U.S. 528, 534 (1963). The psychological and manipulative tactics employed against Ritze cannot be overstated—each of which are described here.

The agents routinely espoused the benefits of cooperation and referenced their ongoing discussions with prosecutors. During the first interview, SA Coughlin told Ritze, "We can't make any deals. That's not our job. Um, but you know, I I [sic] will tell the prosecutor though, who's gonna work this case. Like, hey, Shei-Sheila was you know she was pretty honest with us[.]" 14-RitzeER-3345.

At the commencement of the second interview, and before the vague *Miranda* reminder was given, SA Cho noted the benefits of cooperating, stating "99% of [interrogatees] regret" not cooperating and he was looking for "information that can help us, like I said, it's gonna in turn help you." 14-RitzeER-3349. The agent continued, "[W]e'll take all that into consideration, and we're going to communicate that to our prosecutor." *Id.* SA Cho even alluded Ritze's answers could prevent first-degree

39

murder charges. *See, e.g.*, 14-RitzeER-3430 ("So whatever I tell [the prosecutor] he's gonna believe . . . . But if I believe that you are telling me the truth, I'm gonna go fight for you."); 14-RitzeER-3431 ("[Y]ou're charged with accessory after the fact. Right? But now I'm getting more evidence cause your story is fucked up . . . . Because now when we go to indictment, there could be a different charge. It could be first degree. You know what first degree penalty is in the federal side?"); *see also*, 14-RitzeER-3368, 3395, 3415, 3427.

SA Cho weaponized Ritze's love for her young daughter: "You wanna see her grow up . . . . From the outside, right? And what you're doing right now, is not helping that." 14-RitzeER-3375. SA Cho exploited Ritze's affection for her daughter to overcome her willpower. *See, e.g.*, 14-RitzeER-3376 ("[Y]ou need to help yourself, and help your daughter."); 14-RitzeER-3391 ("You're talking to us now to help you and your child . . . . You're little-little beautiful girl that we see, we see on-on Facebook."); 14-RitzeER-3394 ("So you need to help yourself . . . you need to think about your daughter . . . your cute little innocent daughter that's caught up in this because of you."); 14-RitzeER-3445 ("You gotta think about

40

your kid."); 14-RitzeER-3446 ("Think about your child. Helping her, not you.").

Throughout the interview, SA Cho yelled at Ritze and prevented her from providing complete responses. *See*, *e.g.*, 14-RitzeER-3428 ("[Y]ou don't even have to have b-be law enforcement . . . t-t-to know that's fucking bullshit . . . . That-that you think that I'm dumb for you to tell me a fucked up story like that . . . . It's kind of insulting, really. It-it really is. It really fucking is."); 14-RitzeER-3429 ("[Y]ou think that I'm dumb for you to tell me a fucked up story like that[.]").

SA Cho created a false sense of urgency—as if Ritze's answers could prevent the already-filed criminal action: "Okay, so we are wasting valuable time, and this is valuable time . . . like the clock's on the wall ticking like your, your time is almost done and we're gonna have to go with what we got here which just looks like a bunch of crap." 14-RitzeER-3415; *see also*, 14-RitzeER-3415 ("You're like, right at the edge here. You need to help yourself."); 14-RitzeER-3414 ("This gotta wrap up, okay, we're not, we're not buying the story okay . . . we are wasting valuable time.").

Compounding agents' failure to readvise Ritze of her *Miranda*

41

rights was SA Cho's assertion that Ritze's answers could actually help her. SA Cho referred to the agents as "the good guys," told Ritze "we are here to help," and even asked her "do you think you're going to get in more trouble if you talk?" to which she replied, "No[.]" 14-RitzeER-3397, 3453, 3455. When attempting to elicit a confession regarding Ritze's pecuniary gain, SA Cho went as far as to say, "did he say, I'm gonna give you a cut? Was it ten grand? . . . *Cause if he did, you're not in trouble*[.]" 14-RitzeER-3447 (emphasis added).

The combined force of each of these tactics was sufficient to overcome Ritze's rational intellect and free will. Ritze's statements to law enforcement were involuntary and their admission at trial was erroneous.

### iv. The Evidence's Admission was not Harmless

It cannot be said that the impact of these interrogations was harmless. To begin, the government utilized Ritze's statements from the first interview to charge Ritze with violating § 1001(a)(2). Throughout the trial, Ritze's statements were then a central theme in the government's case. As early as opening statements, the prosecutor highlighted the importance of Ritze's post-arrest statements. 6-RitzeER-

42

1292-93. SA Casey and SA Cho each testified about the interrogations. 9-RitzeER-2107, 2137. Cumulatively, over two hours of the recorded interviews were played for jurors. 9-RitzeER-2114–15, 2137. During the government's closing arguments, the prosecutor referenced Ritze's statements no less than fourteen times. 11-RitzeER-2724–27, 2746–53, 2755–56, 2831–32, 2851.

Ritze's first statement placed Ritze on the boat on October 15, 2019, provided a narrative as to what transpired between Dao and Le, and captured an admission that Ritze left Dao's body in the water and drove away. Her statements during the first interrogation also provided the basis for the § 1001 charge. Ritze's second interrogation gave additional context as to what occurred on the boat and importantly provided the government with a motive to ascribe to Ritze for Dao's killing, namely, obtaining life insurance proceeds. In both closing arguments, prosecutors cited Ritze's admissions about Dao's life insurance policy, coming at the tail end of her abusive jailhouse interview, as a confession of her awareness of the motive for the killing. Without the second recording, there was no evidence that Ritze was aware prior to the shooting of Le's purported goal of obtaining Dao's life insurance proceeds. The prejudicial

43

impact of the recordings infiltrated the proceedings.

On appeal, the government bears the burden of establishing, beyond a reasonable doubt, that the constitutional error "did not contribute to the verdict obtained." *United States v. Williams*, 435 F.3d 1148, 1162 (9th Cir. 2006) (internal citation omitted). The government cannot make that showing here.

### B. The District Court Erred in Admitting Ritze's Statements to Co-Workers

Rule 404(b)(1) prohibits using other act evidence "to prove a person's character in order to show that on particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, such evidence is admissible to establish "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Because "character evidence is of slight probative value and may be very prejudicial, Rule 404 curtails [its] use[.]" *United States v. Wells*, 879 F.3d 900, 926 (9th Cir. 2018) (cleaned up).

Moreover, if the evidence offered serves a permissible purpose under FRE 404(b)(2), it may nevertheless be excluded on the basis of undue prejudice, confusion of the issues, misleading the jury, undue

44

delay, waste of time, or needless presentation of cumulative evidence. *Wells,* 879 F.3d at 929. "Where the evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury." *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992).

On September 27, 2019, the daughter of Ritze's co-worker recorded Ritze while on an irrational rant at the office. Ritze's co-worker asked, "[w]hy you killing people today?" to which Ritze replied, "[w]hy not? I'm gonna take 'em on my boat, they may go on the boat but they are not gonna come back." 12-RitzeER-2874. When asked, "[y]ou're gonna go kill people on your boat?" Ritze said, "Yes." *Id.* Ritze described her "friends that will just go kill people in a heartbeat" and told them, "I'm not killing anybody, I have friends that will." *Id.*

During the time this recording was made, Ritze was routinely intoxicated at the office—drinking and consuming pills throughout the day. 9-RitzeER-2270, 14-RitzeER-3483. Her colleagues knew they could easily provoke Ritze. They chatted amongst themselves, enthusiastic to goad Ritze into making statements they could capture on tape. The conversation was not met with fear or surprise. They collectively laughed

45

and Ritze faced no negative employment consequences.

Pretrial, in response to Ritze's motion to exclude the video, the government claimed the statements were admissible to establish "the killing of James Dao on defendant's boat was not an accident or mistake," but the equivocal nature of the conversation undermined this conclusion. 5-RitzeER-1208. The statements contained no reference to the key figures in this case—namely Dao or Le. Ritze had a history of making similar statements years before she was even introduced to Le. 8-RitzeER-1849–50. There was no mention of any specific plan to kill Dao, or anyone at all. Ritze's reference to her "friends" who "kill people in a heartbeat" suggested past events. Yet, there was no evidence Ritze was in fact aware of any deaths preceding Dao's. There was no evidence Le had killed anyone before the recording.

The potential for "unfair prejudice from the introduction of threats is 'severe.'" *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 898 (9th Cir. 1996) (internal citation omitted). Threats represent "a striking example of evidence that appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or otherwise may cause a jury to base its decision on something other than the established propositions in

46

the case." *United States v. Guerrero*, 803 F.2d 783, 785 (3d Cir. 1986) (internal quotation and citation omitted). So too here. Given the proximity to and manner of Dao's death, the prejudice that resulted from Ritze's prior statements significantly outweighed their minimal probative value.

To some extent, the district court agreed. Pretrial, the district court granted Le's request to exclude this recording from his trial. 5-RitzeER-1239. Although the court characterized the statements as having a "nexus to the homicide," for the purposes of Ritze's trial, the court determined that the statements had "no clear tie to Le" and any implication of such represented a "highly prejudicial," "inferential leap." 1-RitzeER-0133, 5-RitzeER-1242. The district court described the evidence's minimal probative value as "substantially outweighed by the risk of confusing the issues and unfair prejudice to Le." 5-RitzeER-1241. Despite these findings, the evidence was admitted against Ritze causing prejudice infecting the proceedings.

The government referenced Ritze's statements to coworkers incessantly beginning with opening statement. 6-RitzeER-1297–28. Along with the recording itself, the government called two co-worker

47

witnesses—each presenting cumulative testimony regarding the recording. 9-RitzeER-2262–69, 2290. Within the first five minutes of its lengthy closing argument, the prosecutor asserted, "[y]ou can listen to [Ritze] talking about how proud she is that she has 'friends who will kill people in a heartbeat . . . [and] how she's planning to take people on her boat who will 'never come back.'" 11-RitzeER-2722. The recording was replayed for jurors. 11-RitzeER-2723. The government's closing arguments referenced these statements no less than ten times. 11-RitzeER-2722–23, 2730, 2755, 2757, 2828, 2832, 2836, 2838. Jurors zeroed in on the recording, requesting it while deliberating. 3-RitzeER-0644. In its post-trial rulings, the district court acknowledged the statements' effect: "It's apparent that the jury found credibility in . . . the coworkers' statements[.]" 1-RitzeER-0113.

The recording led jurors to believe Ritze had a character for violence and acted in conformance therewith on October 15, 2019. Any minimal probative value was substantially outweighed by undue prejudice. The district court abused its discretion in admitting the evidence.

48

C. The District Court Erred in Permitting the Victim's Mother to be Present During Deliberations

The structural error doctrine was designed "to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial." *Weaver v. Mass.*, 582 U.S. 286, 295 (2017). "Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." *Ariz. v. Fulminante*, 499 U.S. 279, 310 (1991) (quoting *Rose v. Clark*, 478 U.S. 570, 577-78 (1986)). Categories of structural error "are not rigid"—"[a]n error can count as structural even if the error does not lead to fundamental unfairness in every case." *Weaver*, 582 U.S. at 296. The result: "the defendant generally is entitled to 'automatic reversal' regardless of the error's actual 'effect on the outcome.'" *Id.* at 299 (quoting *Neder v. United States*, 527 U.S. 1, 7 (1999)). The district court committed structural error when it erroneously determined a sensitive portion of jury deliberations constituted an open proceeding.

"The right to an open public trial is a shared right of the accused and the public[.]" *Press-Enterprise Co. v. Superior Court*, 478 U.S. 1, 7

49

(1986). This right does not extend to jury deliberations, which have historically been shielded from the public's observation: it is a "cardinal principle that jury deliberations shall remain private and secret[.]" *United States v. Olano*, 507 U.S. 725, 738 (1993) (internal citations omitted); *see also, Forbes Media LLC v. United States*, 61 F.4th 1072, 1077 (9th Cir. 2023). And it cannot be said that the replaying of exhibits does not constitute a portion of jury deliberations. It is for this reason that a district court may allow "the jury to examine the video exhibit *during deliberations* in the same private manner that the jury is entitled to view paper exhibits, photographs, and physical exhibits." *United States v. Chadwell*, 793 F.3d 910, 915 (9th Cir. 2015) (emphasis added). Logic similarly weighs in Appellant's favor. Due to the jury's exclusive task of determining the guilt of the accused, the public plays no role in the functioning of that particular process.

The public has no First Amendment right to be present for any portion of jury deliberations, inclusive of the replaying of exhibits, whether they be shown in the courtroom or secluded away. *See, e.g., Sills v. Bowersox*, 2018 U.S. Dist. LEXIS 142222, *5-6 (E.D. Mo. 2018) ("The unusual circumstance of the jury viewing a video in the courtroom,

50

during their deliberations . . . does not make those proceedings open to the public. Jury deliberations are simply not an event to which the right to a public trial applies.").

The district court committed structural error when it allowed Dao's mother to be present during a delicate portion of jury deliberations. Erroneously, the district court concluded, "[t]he First Amendment rights, I think, prevail" and found the exhibit replay constituted "an opening proceeding." 1-RitzeER-0125, 0128.

Indeed, jurors were "particularly susceptible to influence" when they asked to see the exhibits again. *Musladin v. Lamaque*, 555 F.3d 830, 840 (9th Cir. 2009); *see also, Frantz v. Hazey*, 533 F.3d 724, 742-43 (9th Cir. 2008). In the midst of this especially vulnerable period, jurors were brought into the courtroom to view three video exhibits again. And in the audience sat Dao's grieving mother who had been present throughout the trial, visibly upset and noticeably sobbing. 1-RitzeER-0125–27. It was not difficult for jurors to surmise the grieving mother's role in the case.

While Ritze's fate hung in the balance and jurors' decisions had not been made, Dao's mother was seen in the audience as evidence was viewed again. This type of intrusion undermined the integrity of the trial

51

and verdict. Much like a defendant without an attorney, a trial closed to the public, or a defective reasonable doubt instruction, it is impossible for the Court to perform any harmless error review when the fairness of the trial was compromised. The error was structural and warrants reversal.

### D. The District Court Erred When It Denied Ritze's Motion for Judgment of Acquittal on the Second-Degree Murder Count

Federal Rule of Criminal Procedure 29 provides, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. Proc. 29(a). In its review, the Court determines whether "the evidence, 'viewed in the light most favorable to the government, . . . would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.'" *United States v. Boam*, 69 F.4th 601, 606 (9th Cir. 2023) (quoting *United States v. Graf*, 610 F.3d 1148, 1166 (9th Cir. 2010)). Ritze maintains that the government failed to present sufficient evidence to support a second-degree murder conviction, and the district court erred when it denied her motion for a judgment of acquittal.

Federal law defines murder as "the unlawful killing of a human being with malice aforethought." *United States v. Begay*, 33 F.4th 1081, 1091 (9th Cir. 2022). Murder in the first- and second-degree each require

52

"malice aforethought; they differ in that first-degree murder requires the killing being 'willful, deliberate, malicious, and premeditated,' or committed while perpetrating certain felony offenses.'" *United States v. Bryan*, 2023 U.S. App. LEXIS 23273, *5 (9th Cir. 2023). To satisfy second-degree murder, the government must establish that the defendant (1) "unlawfully killed" the victim; (2) killed with "malice aforethought"; and, relevant here, (3) the killing occurred within the special maritime jurisdiction of the United States. *See* Ninth Cir. Model Crim. Jury Instruction 16.2; 18 U.S.C. § 1111.

The prosecution conceded that Ritze did not fire the fatal shot, and argued Ritze, as an aider and abettor, could also be guilty of second-degree murder by way of accomplice liability. "[U]nder [18 U.S.C.] § 2 'those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime." *Rosemond v. United States*, 572 US 65, 71 (2014) (internal citation omitted).

> i. *The Government Failed to Prove Ritze Harbored the Requisite Mens Rea at the Time of Dao's Death*

"To kill with malice aforethought means to kill either deliberately or intentionally or recklessly with extreme disregard for human life."

*Begay*, 33 F.4th at 1091. The Court has "described malice aforethought as a 'callous and wanton disregard for human life,' and 'extreme indifference to the value of human life.'" *Id.* (citing *United States v. Pineda-Doval*, 614 F.3d 1019, 1037 (9th Cir. 2010).

In the alternative, under an accomplice theory of liability, the "law is clear"—"aiding and abetting contains an additional element of specific intent, beyond the mental state required by the principal crime." *United States v. Sayetsitty*, 107 F.3d 1405, 1412 (9th Cir. 1997). The evidence must establish "a person actively participate[d] in a criminal venture with full knowledge of the circumstances constituting the charged offense." *Rosemond*, 572 U.S. at 77. The accomplice must have "advanced knowledge[,]" to enable her "to make the relevant legal (and indeed, moral) choice." *Id.* at 78. But when the defendant "knows nothing" until the offense has been completed, she may "already have completed [her] acts of assistance; or even if not, [s]he may at that late point have no realistic opportunity to quit the crime"—"and when that is so, the defendant has not shown the requisite intent to assist [the] crime." *Id.*; *see also, United States v. Goldtooth*, 754 F.3d 763, 769 (9th Cir. 2014).

There was an overwhelming dearth of evidence regarding Ritze's

54

malicious intent when her boat left the Dana Point Harbor in the early hours of October 15th and proceeded three miles offshore. At that moment in time, before Le fired the deadly shots, there is little evidence of any plan to kill Dao—let alone Ritze's foreknowledge of one. Knowing this, the government presented Ritze's prior statements in an attempt to salvage a finding of malice aforethought.

First, as described *infra*, the government introduced a recording wherein Ritze made generic threats to her co-workers without reference to a specific victim or plan. 2-RitzeER-2874.

Second, ten days prior to the fishing trip, Ritze purportedly conveyed to Sandra that Le and Ritze would be "offing" Dao that weekend in Las Vegas. Yet, Sandra's claims regarding Le and Ritze's statements were entirely inconsistent with her behavior in Las Vegas. Although Sandra testified that her interactions with Le and his friends were "the scariest thing [she had] ever been through," Sandra described these men as "nice enough," was seen smiling in photos and videos taken during the weekend, went go-kart riding with the group the following day, and never reported the incident to law enforcement ahead of Ritze's arrest. 8-RitzeER-1926, 1928, 1951–52, 1967–72. Sandra's statements, motivated

55

by her desire to keep "that witch in jail" and obtain custody of River, was the only witness to testify that Ritze had prior knowledge and intended to kill Dao. 8-RitzeER-1934, 2010–12. But jurors squarely rejected Sandra's testimony when they concluded Ritze did not premeditate and deliberate Dao's death. Try as they might, neither of these statements constituted evidence, beyond a reasonable doubt, of the requisite *mens rea*.

Indeed, there was very little evidence of what actually transpired offshore aside from Ritze's post-arrest statements. But no malice or specific intent can be inferred. Ritze relayed that she was piloting the boat when she heard a loud "bang"—a sound she attributed to the boat's engine backfiring. 12-RitzeER-2945. Ritze turned around, saw Le and Dao "wrestling," heard additional gunshots and saw Dao fall into the water. 12-RitzeER-2895. With a gun in hand, Le ordered Ritze, "Go, go, go!" 12-RitzeER-2933. "Freaked out," Ritze complied and brought the boat back to the harbor. 12-RitzeER-2944.

Ritze's actions, or lack thereof, adds credence to her assertion that the malice aforethought or specific intent to aid Le was never formed ahead of Dao's death. Ritze was adamant that Dao purchase a fishing

56

license and lobster card—without one, he would not be permitted on the boat. 7-RitzeER-1524, 8-RitzeER-1796, 10-RitzeER-2405. Had the fishing trip been a mere ruse, why create this unnecessary paper trail? On October 14, 2019, between 11:30 and 11:45 p.m., Ritze called her friend to wish her a happy birthday and alerted her about Ritze's imminent fishing plans. 9-RitzeER-2228–29. Her friend understood Le would be on board. Had Ritze been privy to a plan by Le to kill Dao, this call would never have ensued.

Even after Dao's fall from her boat, nothing was done to Dao's body. 6-RitzeER-1359. Dao's bright orange jacket was never removed. 6-RitzeER-1334. The anchor, chain, and rope weighed more than enough to sink Dao's body—but no such efforts were made. 6-RitzeER-1397–98, 11-RitzeER-2615.

Ritze was acquitted of first-degree murder reflecting the lack of evidence bearing on Ritze's premeditation and deliberation and supporting Appellant's position here: the government did not present sufficient evidence that Ritze had malice aforethought or the specific intent to aid Le before Dao's death. The jury's determination that such evidence was insufficient to show, beyond a reasonable doubt, that Ritze

57

premediated and deliberated Dao's death before the fateful lobster fishing trip should be considered in undergoing the instant inquiry. *See United States v. Tierney*, 424 F.2d 643, 645 (9th Cir. 1970) (An acquittal on conspiracy count will preclude conviction of aiding and abetting if "the acquittal results in a finding of fact in favor of the defendant which is essential to the substantive offense.").

The facts presented here do not support a finding that Ritze harbored malice aforethought or specifically intended to aid Le in Dao's murder. There is a glaring absence of evidence that Ritze had any foreknowledge of any plot to kill Dao ahead of hearing the gunshots. But even after Ritze realized Dao had been shot in close proximity, and saw him fall overboard, Ritze had no reason to believe that Dao was still alive. Thus, Ritze could not intend to do acts with reckless disregard for human life when it was just as likely that Dao had already passed. In the alternative, Ritze could not have been convicted as an aider and abettor because she "had no realistic opportunity to quit the crime," and did not actively participate "knowing its extent and character" and intending "the scheme's commission." *Rosemond*, 572 U.S. at 77. Under either theory, the government failed to prove the requisite intent beyond a

58

reasonable doubt.

### ii. The Government Failed to Establish Ritze Caused or Aided Dao's Death

"A basic tenet of criminal law is that the government must prove that the defendant's conduct was the legal or proximate cause of the resulting injury." *United States v. Main*, 113 F.3d 1046, 1050 (9th Cir. 1997)(internal citation omitted). "A proximate cause is one which played a substantial part in bringing about the death, so that the death was the direct result or a reasonably probable consequence of the defendant's [conduct.]" *Pineda-Doval*, 614 F.3d at 1025 (internal quotation omitted). When, as here, a crime requires "not merely conduct but also a specified result [i.e., death] of conduct," then a defendant "generally may not be convicted unless his conduct is 'both (1) the actual cause, and (2) the legal cause (often called the proximate cause) of the result.'" *Burrage v. United States*, 571 U.S. 204, 210 (2014) (cleaned up); *see also, United States v. Swallow*, 109 F.3d 656, 659 (10th Cir. 1997) ("Proximate cause of death is an essential component of both first- and second- degree murder."); *United States v. Woody*, 250 Fed. Appx 867 (10th Cir. 2007) (Reversing murder conviction due to government's failure to prove defendant's

59

conduct proximately caused victim's death).

Under an aider and abettor theory of liability, the government must establish Ritze "assisted or participated in the commission of the underlying substantive offense." *Sayetsitty*, 107 F.3d at 1412. The defendant must "take some affirmative steps 'to aid the venture or assist[] the perpetrator of the crime.'" *United States v. Morrison*, 833 F.3d 491, 501 (5th Cir. 2016) (internal citation omitted).

There was no evidence Ritze personally inflicted any of Dao's wounds or caused him to fall overboard—even the government conceded as much in its closing argument. 11-RitzeER-2724 ("It's abundantly clear—really beyond any doubt from the evidence in this case—that Wayne Le shot James Dao[.]"). As such, the government was required to prove beyond a reasonable doubt that Ritze's act of leaving Dao in the water and driving the boat away was a contributing cause of his death.

Much of the government's closing argument focused on Ritze's alleged premeditation and deliberation. However, the government asked the jury to return a second-degree murder conviction "if [jurors] d[idn't] believe that Sheila Ritze was in on it from the beginning[.]" 11-RitzeER-2755. The prosecutor continued, "[s]o if you believe that she had – did

60

[sic]not know when she went out that night that she and Wayne were going to kill James Dao, she still committed second-degree murder. She still killed or aided and abetting [sic] the killing of James Dao. *She did that by leaving him in the middle'a [sic] the ocean* more than 3 miles from shore in the middle'a [sic] the night." 11-RitzeER-2756 (emphasis added). The government further argued, "leaving [] Dao in the water" was "what killed him[.]" 11-RitzeER-2727. But under this theory, Ritze could only be found guilty of second-degree murder if her act of driving her boat away from Dao's body *caused* his death. The government's own evidence belies this conclusion.

Dr. Paunovic could not testify with any confidence as to the role Ritze's actions played in Dao's death. When asked whether Dao would have survived if he had been "pulled from the water after he'd been shot and beaten," Dr. Paunovic testified, "it's hard to say how fast pulled out from the water because it takes few minutes to drown. So if he was literally taken out the water within a minute and taken to a hospital *maybe* he would survive." 6-RitzeER-1381 (emphasis added). When prompted further, "[y]ou really don't know if Mr. Dao was picked up out of the water and taken back to Dana Point or some other location along

61

the coast whether he would've survived or not, do you? she admitted, "*I don't.*" 6-RitzeER-1424 (emphasis added).

The government's own expert created reasonable doubt—any rational juror would be unable to find, beyond a reasonable doubt, that Ritze's actions caused Dao's death. Even if Ritze intended to facilitate the second-degree murder in the brief moments after seeing Dao's body overboard, her act of leaving Dao in the water and driving away does not establish causation. The government failed to present proof that Ritze's act of leaving Dao in the water caused Dao's death because it was just as likely that he would have died even if Ritze made immediate efforts to save him as the coroner acknowledged. Ritze witnessed Le shoot Dao in close proximity. That the gunshots were not immediately fatal was a total random circumstance leading to the unanswerable question of whether the wounds were inevitably and inherently fatal no matter what Ritze's subsequent actions entailed. Ritze did not knowingly participate in Dao's death—and was ignorant to its commission until it was too late.

In sum, even in the light most favorable to the government, the government failed to prove, beyond a reasonable doubt, that Ritze (1) harbored the requisite intent prior to Dao's death and (2) aided in the

62

commission of and ultimately caused Dao's death. As such, the district court erred when it denied Appellant's motion for judgment of acquittal.

### E. The District Court Abused its Discretion When it Denied Ritze's Motion for a New Trial

The district court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. Proc. 33(a). The court's "power to grant a motion for a new trial is much broader than its power to grant a motion for judgment of acquittal." *Alston*, 974 F.2d at 1211. "The district court need not view the evidence in the light most favorable to the verdict; it may weight the evidence and in so doing evaluate for itself the credibility of the witnesses." *Id.* (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).

Ritze asserted that a new trial was warranted on multiple grounds, many of which were addressed *supra*: (1) the government did not present sufficient evidence to support the second-degree murder conviction; (2) Ritze's custodial interrogations were admitted in error; and, (3) the victim's mother's presence during jury deliberations constituted structural error. Appellant need not repeat these arguments but maintains that each independently support relief pursuant to FRCP 33.

63

A new trial is also warranted on a fourth ground—the new trial would allow Ritze to present a defense specific to second-degree murder. The government devoted a great majority of its case to establishing Ritze premeditated and deliberated Dao's death—focusing on Ritze's conduct before and after Dao's killing. Although first- and second-degree murder have overlapping elements, evidence and tactical considerations between the two were leagues apart. The evidence bearing on first-degree murder focused on the conduct before and after the boat trip. The government's evidence for second-degree murder was limited to Ritze's conduct on the boat.

The defense was forced to devote a vast majority of its trial presentation to countering the first-degree murder charge and forewent defense evidence bearing on Ritze's guilt of second-degree murder. For instance, a previously retained expert, Dr. Nancy Kaiser-Boyd, Ph.D., concluded Ritze scored high on the PTSD scale and could have shed light on whether Ritze's post-shooting conduct was reckless given her psychological impairments. 13-RitzeER-3032–41. Given the high stakes of the first-degree murder charge, Ritze's counsel did not call Dr. Kaiser-Boyd as a witness as a result of a racially insensitive remark Ritze made

64

during the session. *Id.* Had Ritze been aware that first-degree murder would be off the table, the defense may have also found it beneficial to call Ritze to testify as to what had happened on the boat. 2-RitzeER-0516–17.

A trial devoted to second-degree murder would allow the defense to focus its opening statement and closing summation to the single charge. Given the government's almost-exclusive focus on the leading charge, and its detrimental penalty, Ritze's defense dedicated almost the entirety of its argument on defending against the first-degree murder charge.

Because "fundamental fairness" and "the interests of justice" are the touchstones of FRCP 33, a new trial should be afforded here.

F. <u>The District Court Erred When it Failed to Apply the § 3B1.2 Minor Role Adjustment</u>

"The Sentencing Guidelines provide district courts with tools for distinguishing among individuals who commit the same crime but have different levels of relative culpability." *United States v. Rodriguez*, 44 F.4th 1229, 1232 (9th Cir. 2022) (citing U.S.S.G. § 3B1.2). To receive the § 3B1.2 minor role adjustment, "the defendant must prove that he was 'substantially less culpable than the average participant in the charged

65

criminal activity.'" *United States v. Klensch*, 87 F.4th 1159, 1163 (9th Cir. 2019) (quoting *United States v. Diaz*, 884 F.3d 911, 915 (9th Cir. 2018)).

The district court must perform a three step analysis. *United States v. Dominguez-Caicedo*, 40 F.4th 938, 960 (9th Cir. 2022). First, identify "the individuals for whom there is 'sufficient evidence of their existence and participation in the overall scheme.'" *Id.* (quoting *United States v. Rojas-Millan*, 234 F.3d 464, 474 (9th Cir. 2000)).

Second, "calculate a rough average level of culpability for these individuals, taking into consideration the five factors in comment 3(C) to the Mitigating Role Guideline": (1) "the degree to which the defendant understood the scope and structure of the criminal activity"; (2) "the degree to which the defendant participated in planning or organizing the criminal activity"; (3) "the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority"; (4) "the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts"; and, (5) "the degree to which the defendant stood to benefit from the criminal activity." U.S.S.G. § 3B1.2, App. Note 3(C)(i)-

66

(v).

District courts "must consider *all* of these factors when determining whether to grant a mitigating-role adjustment." *Rodriguez*, 44 F.4th at 1233 (citing *United States v. Quintero-Leyva*, 823 F.3d 519, 523 (9th Cir. 2016) ("Because the record is unclear as to whether the court considered all the factors, we reverse[.]")); *Diaz*, 884 F.3d at 916 ("[T]he assessment of a defendant's eligibility for a minor-role adjustment must include consideration of the factors[.]").

Third, if the court determines "the defendant is substantially less culpable than that average and meets the other criteria, [s]he should be granted a mitigating role adjustment." *Dominguez-Caicedo*, 40 F.4th at 960.

The district court did not make *any* reference to these factors but cited five examples of Ritze's "callousness" before denying the adjustment: (1) Ritze's comments to her co-workers; (2) Ritze's failure to make "some attempt to stop and bring [Dao] from the water[.]"; (3) statements to the effect of, "Don't look at him, because, basically he's not going to be here"; (4) the placement of the GPS device on Nguyen's vehicle and "pursuit of the $100,000"; and, (5) Ritze's retrieval of the boat and

67

continued relationship with Le. 1-RitzeER-0069–72.

Although district courts are not required to "tick off sentencing factors to show that [they] considered them," courts must "explain their sentencing decisions." *Klensch*, 87 F.4th at 1164 (quoting *Diaz*, 884 F.3d at 916); *see also, United States v. Emmett*, 749 F.3d 817, 820 (9th Cir. 2014) ("[D]istrict courts have a duty to explain their decisions."). The district court did not engage in the *Dominguez-Caicedo* test and made no reference to the five factors set forth in the Guidelines. Reversal is warranted on this basis alone.

Had the district court engaged in the appropriate analysis, it would have determined Ritze was entitled to the two-level reduction. It was Le, and Le alone, who shot and ultimately killed Dao. Ritze had no foreknowledge of and maintained no decision-making authority in connection with Dao's death. And there is no evidence Ritze stood to benefit, pecuniary or otherwise from the offense. Indeed, and as argued by the government, it was Le who had a personal vendetta against Dao. It was Le who routinely asked Nguyen about the status of Dao's life insurance proceeds. And it was Le who shot and killed Dao.

And the district court implicitly conceded Ritze's disparate role in

68

the offense. Only after its denial of the adjustment's application, the court stated, "I agree, you're one step lower than Mr. Le in this, and Mr. Le . . . is going to get, potentially a much more significant sentence.[5] You are not first degree." 1-RitzeER-0082. Certainly, Ritze was substantially less culpable than Le. Vacatur and remand is appropriate here.

G. The District Court Erred When it Refused to Adopt a Variance Based on Ritze's Personal History

A district court is "required to 'consider' the [18 U.S.C.] § 3553(a) factors" in its imposition of a sentence. *United States v. Trujillo*, 713 F.3d 1003, 1009 (9th Cir. 2013). Ritze's sentencing pleadings and corresponding exhibits evidenced numerous mitigating factors inclusive of Ritze's troubled upbringing, fragile emotional state including PTSD leading up to and during the offense conduct, substance abuse, loving relationship with her daughter, model behavior while in custody, and a need to avoid disparity in sentencing. 2-RitzeER-0289.

The Presentence Report erroneously concluded that there was no basis for a variance. PSR-27. Likewise, the district court made no mention of these arguments or evidence. Although it stated that it

---

[5] Le received a much more significant sentence—life imprisonment.

69

"carefully considered the circumstances of the offense, and the history and characteristics of the Defendant," the district court failed to explain its rejection, with any specificity, of the non-frivolous, mitigating arguments advanced in support of a reduced sentence. A court's failure to address defendant's non-frivolous arguments in support of a reduced sentence constitutes an abuse of discretion. *See, e.g., Trujillo*, 713 F.3d at 1010-11. Such error occurred here, warranting vacatur and remand.

## CONCLUSION

Based on the foregoing, the Court should vacate Appellant's judgment and conviction and sentence.


Dated:  July 11, 2024                    Respectfully Submitted,

                                         s/ David W. Wiechert

                                         DAVID W. WIECHERT
                                         WIECHERT, MUNK & GOLDSTEIN, PC
                                         4000 MacArthur Blvd., Ste. 600
                                         Newport Beach, California
                                         (949) 361 2822
                                         DWiechert@aol.com


                                         s/ Courtney L.C. Cefali

                                         COURTNEY L.C. CEFALI
                                         CEFALI & CEFALI, APC
                                         27136 Paseo Espada, Ste. 1123
                                         San Juan Capistrano, CA 92675
                                         (949) 325 7790
                                         Courtney@callcefali.com

                                         *Counsel for Defendant-Appellant,*
                                         *Sheila Marie Ritze*

## STATEMENT OF RELATED CASE

Counsel is aware of a related case currently pending before this Court. The Court has consolidated the instant matter with *United States v. Hoang Xuan Le*, Ninth Circuit Case No. 23-1814. (Dkt. 6).

Dated:  July 11, 2024          Respectfully submitted,

s/ David W. Wiechert
DAVID W. WIECHERT
*Attorney for Defendant-Appellant*,
Sheila Marie Ritze

72

## CERTIFICATE OF COMPLIANCE

This brief, excluding the parts of the document exempted from Fed. R. App. P. 32(f)), contains 13,493 words. This brief complies with the typeface and type size requirements of Fed. R. App. P. 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

This brief is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


Dated:  July 11, 2024                    Respectfully submitted,

                                         s/ David W. Wiechert
                                         DAVID W. WIECHERT
                                         *Attorney for Defendant-Appellant*,
                                         Sheila Marie Ritze